SEALED

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

MAY 2 7 2016

CLERK U.S. DISTRICT COURT
By _____
Deputy

# United States District Court

**NORTHERN** _____ **DISTRICT OF** _____

**In the Matter of the Search of**
<small>(Name, address or Brief description of person, property or premises to be searched)</small>
Information associated with Instagram
usernames sonny_mustrick and
michael_mustirik that are stored at premises
controlled by Instagram LLC

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

**CASE NUMBER:** 3:16-MJ-464-BH

I ___Cynthia M. Roberts___ being duly sworn depose and say:

I am a(n) **Special Agent with the Social Security Administration (SSA) Office of Inspector General (OIG)** and have reason to believe that on the person of or **XX** on the property or premises known as <small>(name, description and/or location)</small>

(SEE ATTACHMENT A).

in the Northern District of Texas there is now concealed a certain person or property, namely (describe the person or property to be seized)

(SEE ATTACHMENT B).

**which is** <small>(state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)</small>
property that constitutes evidence of the commission of a crime, contraband, the fruits of crime, and is, otherwise, criminally possessed, **concerning a violation of Title _42_ United States code, Section(s) _1383a(a)(3)_. The facts to support a finding of Probable Cause are as follows:**

(SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT PHILLIP CAMPBELL).

**Continued on the attached sheet and made a part hereof.** **XX** Yes __ No

_____
Signature of Affiant
CYNTHIA M. ROBERTS
Special Agent, SSA-OIG

**Sworn to before me, and subscribed in my presence**

**May 27, 2016** _____ **at** _____ **Dallas, Texas** _____
Date                                                          City and State

**IRMA CARRILLO RAMIREZ**
**United States Magistrate Judge** _____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the Instagram profiles with usernames: sonny_mustrick and michael_mustirik that are stored at premises owned, maintained, controlled, or operated by Instagram, LLC, a company that is owned by Facebook, Inc. and headquartered in Menlo Park, California.

## ATTACHMENT B

**Particular Things to be Seized**

I.      **Information to be disclosed by Instagram, LLC**

To the extent that the information described in Attachment A is within the possession, custody, or control of Instagram, LLC, including any messages, records, files, logs, or information that have been deleted but are still available to Instagram, LLC, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Instagram, LLC is required to disclose the following information to the government for each account listed in Attachment A:

a.  All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

b.  All past and current usernames associated with the account;

c.  The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

d.  All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

e.  All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

f.  All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

g.  All communications or other messages sent or received by the account;

h.  All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content;

i.  All photographs and images in the user gallery for the account;

j.  All location data associated with the account, including geotags;

k.  All data and information that has been deleted by the user;

l.     A list of all of the people that the user follows on Instagram and all people who are following the user (*i.e.*, the user's "following" list and "followers" list), as well as any friends of the user;

m.    A list of all users that the account has "unfollowed" or blocked;

n.     All privacy and account settings;

o.     All records of Instagram searches performed by the account, including all past searches saved by the account;

p.     All information about connections between the account and third-party websites and applications; and,

q.     All records pertaining to communications between Instagram, LLC and any person regarding the user or the user's Instagram account, including contacts with support services, and all records of actions taken, including suspensions of the account.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 42 U.S.C. § 1383a(a)(3) involving Michael Mitchell and Sonny Mitchell since November 2013, including, for each username identified on Attachment A, information pertaining to the following matters:

(a) Communications between anyone and Michael Mitchell or Sonny Mitchell, discussing Michael Mitchell, Sonny Mitchell, Doreen Mitchell, John Mitchell, SSA, any type of disability benefits, and any and all steps taken in furtherance of the scheme.

(b) Any photographs, videos or user posts or comments, either posted by Michael Mitchell, Sonny Mitchell or another individual, showing Michael Mitchell, Sonny Mitchell or Doreen Mitchell's activities of daily living.

(c) Any photographs, videos or user posts or comments, either posted by Michael Mitchell, Sonny Mitchell or another individual, showing Michael Mitchell, Sonny Mitchell or Doreen Mitchell's work activity.

(d) Any photographs, videos or user posts or comments, either posted by Michael Mitchell, Sonny Mitchell or another individual, showing Michael Mitchell, Sonny Mitchell, Doreen Mitchell's travel.

(e) Any photographs, videos or user posts or comments, either posted by Michael Mitchell, Sonny Mitchell or another individual, showing Michael Mitchell, Sonny Mitchell or Doreen Mitchell's social functioning or association with other individuals.

(f) Evidence indicating how and when the Instagram account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Instagram account owner;

(g) Evidence indicating the Instagram account owner's state of mind as it relates to the crime under investigation;

(h) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Cynthia M. Roberts, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.      I am a Special Agent with the U.S. Social Security Administration (SSA), Office of Inspector General (OIG), and have been since November 2012.  I have been a Special Agent with other federal agencies since September 1997.  As a Special Agent for SSA-OIG, I investigate, among other things, allegations of fraud, waste and abuse related to SSA programs.

2.      I make this affidavit in support of an application for a search warrant for information associated with the Instagram usernames sonny_mustrick and michael_mustirik (the "SUBJECT ACCOUNTS") that are stored at premises owned, maintained, controlled, or operated by Instagram, LLC, ("Instagram") a social-networking company owned by Facebook, Inc. and headquartered in San Francisco, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A), to require Instagram to disclose to the government records and other information in its possession, including the contents of communications, pertaining to the subscribers or customers associated with the SUBJECT ACCOUNTS.

3.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 42 U.S.C. § 1383a(a)(3), Concealing a Disqualifying Event from the Social Security Administration, have been committed by Michael Mitchell, Sonny Mitchell, Doreen Mitchell and John Mitchell.  There is also probable cause to search the SUBJECT ACCOUNTS for information described in Attachment A for evidence of these crimes and items to be seized, which are listed in Attachment B.

4.      The SSA is an independent agency of the executive branch of the United States. The SSA is responsible for administering programs under the Social Security Act, codified at Title 42, United States Code, Section 301, et. seq.   Relevant to the instant affidavit, these programs include the Supplemental Security Income program for the Aged, Blind, and Disabled under Title XVI of the Social Security Act (hereinafter "SSI Program").   The SSI program, which is funded through general tax revenues of the United States, provides monthly cash benefits to individuals who are medically "disabled" within the meaning of the Title XVI and who, in addition, are eligible for the program on the basis of financial need.

5.      The ability of the SSA to properly make initial determinations as to an applicant's medical and financial eligibility for the SSI program is directly dependent upon the SSA's access to accurate and current information regarding that applicant.   Moreover, if an applicant is initially found to be eligible, and therefore becomes an SSI recipient, the SSA's ability to properly determine that recipient's continuing eligibility, and the correct monthly benefit due that recipient, likewise is directly dependent upon the SSA's ongoing access to accurate and current information regarding that recipient.

6.      To achieve that end, the SSA requires disabled SSI recipients to advise the SSA of any improvements in their medical condition, their return to work of any kind, and any changes in their income, resources, address, living arrangements, family size or composition, family income or resources, or absences from the United States for thirty consecutive days or more.   The SSA also requires SSI recipients to periodically complete various forms and questionnaires as a means of updating eligibility and benefit level information.   Like the initial application, these forms and questionnaires again notify the recipient of his or her continuing responsibility to notify the SSA of any changes in his or her condition.

2

7.      A representative payee is an individual approved by the SSA to manage a beneficiary's funds to ensure that his needs are met.  Representative payees are typically named to receive benefits on behalf of a beneficiary who is incompetent, either by age or disability.  In cases where a beneficiary is appointed a representative payee, that representative payee is responsible both for using all funds paid for the benefit of that beneficiary for his daily needs and promptly informing the SSA if the beneficiary's condition improves or he returns to work.

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## Probable Cause

9.      Probable cause exists to believe that evidence, fruits, or contraband can be found in the SUBJECT ACCOUNTS related to an investigation that Michael Mitchell and Sonny Mitchell, the purported holders of the accounts, as well as Doreen Mitchell and John Mitchell, knowingly participated in a scheme to defraud the Government related to SSA benefits in violation of 42 U.S.C. § 1383a(a)(3).   If, at any time, I make reference to an individual named "Patrick Rena," this is truly a reference to John Mitchell, who often uses the identity of Patrick Rena when conducting Social Security related business.

### Michael Mitchell

10.     As background, Michael Mitchell was issued SSN 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 in December 1985.  The SSA's systems list his parents as Doreen Mitchell and John Mitchell.

11.     Relevant to the instant search warrant affidavit, beginning in or around 2001, Doreen Mitchell and John Mitchell made a series of representations to the SSA, more fully

3

described below, that caused the SSA to believe that Doreen Mitchell's son, Michael Mitchell, was more mentally impaired than he truly was. Based on these representations, the SSA concluded that Michael Mitchell was eligible for SSI benefits. Additionally, since May 2014, Doreen Mitchell, John Mitchell, Michael Mitchell and Sonny Mitchell have appeared at interviews and examinations and knowingly and willfully misrepresented their actual levels of intelligence and functioning in order to ensure their benefits would continue.

12.     On or about March 29, 2001, while he was still a minor, Doreen Mitchell applied for SSI benefits on Michael Mitchell's behalf, based on allegedly disabling mental impairments, including but not limited to mild mental retardation.   At a July 20, 2001 psychological consultative examination, paid for by the SSA and related to Michael Mitchell's benefits application, the examiner assessed a Vineland Social Maturity Scale score of 55, which yielded a social age of 4.8 years old (he was 15 years old at the time) and a social quotient of 30, which led the examiner to assess a provisional diagnosis of moderate mental retardation.   As a result, the SSA concluded that Michael Mitchell was disabled and entitled to SSI payments.

13.     In or around 2004, the SSA / OIG / Cooperative Disability Investigations (CDI) Unit initiated an investigation into the Mitchell family based on an allegation that multiple family members were receiving benefits for the same or similar conditions, as well as inconsistencies in the SSA claim files.   As part of this investigation, on May 6, 2004, during an approximately 35-minute ruse interview with an SSA / OIG Special Agent and a local sheriff's office detective working in the CDI Unit, Michael Mitchell was able to converse with investigators and answer most of the questions asked of him without hesitation.   Contrary to the 2001 findings described above, he reported that he did some automotive work; drove a car despite not having a driver's license; shopped regularly; could handle cash; and had gone to Las

Vegas to get married six months prior to the interview. He also arranged an interview between the investigators and his mother for the following day, though that interview ultimately did not take place. Yet on May 22, 2004 – a little more than two weeks later – at a consultative examination related to his application for SSI benefits, Michael Mitchell would not respond to questions or speak, and no intelligence test could be performed because he did not cooperate with the examination.

14.     As a result of the CDI investigation, Michael Mitchell's benefits were ceased because he did not meet the requirements of the SSI program. During the appeal of this decision, at a subsequent hearing related to his benefits, a hearings officer noted that Michael Mitchell had no problems talking to people whom he believed had nothing to do with his disability claim, but did not talk to people or answer questions when he was to see a counselor or other professional trying to evaluate his alleged mental condition. However, once Michael Mitchell appealed his cessation to an Administrative Law Judge (ALJ) that ALJ ordered a consultative examination in September 2007, at which Michael Mitchell was once again mute, uncooperative, and displayed evidence of disorientation and limited intelligence. As a result, the ALJ issued a decision relying entirely on these findings, giving little weight to the opinion that Michael Mitchell had no mental impairment and failing to reference either the hearings officer's findings or the CDI investigation in his decision. The ALJ reinstated Michael Mitchell's benefits.

15.     Since in or around May 2014, I have conducted a second investigation into the Mitchells for similar conduct. On or about October 8, 2014, Michael Mitchell appeared for an interview related to his entitlement to SSI benefits at the SSA's Mid-Cities Office in Grand Prairie, Texas. Doreen Mitchell and John Mitchell, using the alias Patrick Rena, accompanied him. Michael Mitchell attended the interview wearing a t-shirt and athletic shorts with unkempt

hair and an unshaven face. He sat down, facing off to the side, and would not look either of the SSA employees in the eye or respond to questions. Doreen Mitchell and John Mitchell claimed that Michael Mitchell needed help completing simple tasks, did not interact with anyone he did not know (and, in fact, spoke only to her and John Mitchell), and had not worked since his last disability hearing in or around 2007. SSA employees reviewed the redetermination paperwork associated with this interview with both Doreen Mitchell and Michael Mitchell, who both signed forms indicating that they understood that anyone who misrepresented facts or lied to SSA was committing a federal crime. Doreen Mitchell signed the form in cursive and Michael Mitchell signed the form with a simple "M".

16.     Contrary to Michael Mitchell's appearance at this interview and the representations made to SSA regarding Michael Mitchell's functioning, later that same day, Michael Mitchell was observed driving a vehicle, alone, which advertised paintless dent repair, and purchasing items from a gas station. On November 26, 2014, Michael Mitchell drove from an address in White Settlement to Doreen Mitchell's known residence, which is approximately 23 miles away. Michael Mitchell was also seen driving on January 8, 2015, again displaying signs on the vehicle advertising on the spot body repair. On January 16, 2015, Michael Mitchell drove his own vehicle from Doreen Mitchell's residence to a funeral home in Irving, Texas, where he spent the entire day and was observed socializing with family and friends. On January 21, 2015, Michael Mitchell was seen driving to a QT gas station, alone, and purchasing items. He was later followed to a business where he appeared to be assisting friends or family with the purchase of a vehicle. Michael Mitchell test drove the vehicle and inspected the engine compartment as well as the vehicle's title. Further, from July 2014 through February 2015, Michael Mitchell conducted three transactions at ACE Cash Express, indicating that he is able to

handle and manage money.  As he was able to leave the house unaccompanied, drive, perform work activity, and socialize with large groups of people, as well as appear to handle money and read a car title, Michael Mitchell clearly demonstrates a higher level of functioning than he related to the SSA.

17.    On or about July 21, 2015, Michael Mitchell also appeared for a consultative examination with Dr. Alicia Coleman for the purpose of determining his continued right to disability benefits.  During the interview, Michael Mitchell was uncooperative, selectively responsive and deemed to be a poor historian, so Dr. Coleman was required to obtain some information from John Mitchell, who appeared as Patrick Rena.  Michael Mitchell wore stained and ill-fitting clothing, displayed poor hygiene and he frequently mumbled and was unintelligible at times.  He claimed to experience auditory hallucinations of laughter, saw "all kinds" of people "all of the time," and reported symptoms of anxiety around "everyone I don't know."  Contrary to what was observed prior to the examination, Michael Mitchell reported he was dependent upon others, specifically Patrick Rena, for transportation because riding the bus was "too scary," and that his family accompanied him shopping for basic necessities.  He reported he spent his day watching cartoons.  He responded to a question regarding whether he had ever had surgery with "pizza."  Moreover, he could not identify his birth day, month, or year; the day of the week; or the city, county or state that he was in.  While Michael Mitchell stated to Dr. Coleman that he did not know letters and could not sign his name, he had signed other documents in his SSA file.  As a result of the examination, Dr. Coleman determined that the information Michael Mitchell presented indicated a developmental or psychotic disorder, but that he seemed to overly emphasize the negative aspects of his condition for secondary gain.  She did not believe the examination to be a valid assessment of Michael Mitchell's abilities or a valid

representation of his true level of functioning and current abilities due to lack of cooperation and effort.

18.     Contrary to Michael Mitchell's statements and presentation during the examination, two days later, on the afternoon of July 24, 2015, Michael Mitchell had care of a child, who he took to a gas station.  While there, he pumped gasoline and talked to another customer about automotive bodywork, pointing to magnetic signs on his door. Michael Mitchell then drove for approximately one hour, but he drove in a manner intending to keep others from following him.

19.     Based on the above information, including surveillance obtained on July 24, 2015, showing Michael Mitchell soliciting business for automobile repairs, I have reason to believe that Michael Mitchell has been and continues to perform work for cash, but has failed to report that work activity or income to the SSA.  Moreover, his credit report indicates that he stated he had a job in order to secure credit to purchase a vehicle.

20.     Additionally, Michael Mitchell has presented himself to the SSA, and others have alleged on his behalf, that he cannot associate with others, read or write, and was dependent on others for assistance.   As surveillance indicates that he enjoys a much higher level of functioning, there is reason to believe that his Instagram account may contain evidence that he is not as mentally deficient or unable to associate with others as he has presented to the SSA, including items such as correspondence with others and photographs of social activities, in addition to the evidence regarding work activity already discussed above.

*Sonny Mitchell*

21.     Sonny Mitchell was issued SSN 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 in November 1988.  The SSA systems show his parents as Doreen Mitchell and Danny Mitchell.  He received one replacement Social Security card in 2002 under his same name.

22.     Relevant to the instant search warrant affidavit, beginning in or around 2002, Doreen Mitchell and John Mitchell made a series of representations to the SSA, more fully described below, that caused the SSA to believe that Doreen Mitchell's son, Sonny Mitchell, was more mentally impaired than he truly was.  Based on these representations, the SSA concluded that Sonny Mitchell was eligible for SSI benefits.

23.     Doreen Mitchell applied for SSI benefits on Sonny Mitchell's behalf in or about early 2002, based on allegedly disabling mental impairments, including but not limited to mild mental retardation.  Patrick Rena assisted in the completion of Sonny Mitchell's disability application and associated paperwork.  In or around August 2002, Sonny Mitchell was approved for benefits.

24.     In or about November 2004, as part of the CDI investigation, Sonny Mitchell was ordered to attend a psychological consultative examination, at which he sat with his head bowed while his cousin, Patrick Rena, was interviewed.  During the examination, he demonstrated no speech and an examiner determined a direct mental examination was not feasible.  His benefits were continued.

25.     In 2007, when he turned 18, Sonny Mitchell underwent another consultative examination to determine whether his benefits should be continued.  At that evaluation, his only cooperative effort was drawing geometric figures on request.  Otherwise, he sat with his head down and was uncommunicative, made poor eye contact, appeared to have a minimal

vocabulary, and was unable to draw a figure commonly drawn by an average three-year-old. His benefits were again continued.

26.     On or about October 8, 2014, Sonny Mitchell appeared for an interview related to his entitlement to SSI benefits at the SSA's Mid-Cities Office in Grand Prairie, Texas.  Doreen Mitchell and John Mitchell, using the alias "Patrick Rena," accompanied him.  Sonny Mitchell arrived wearing a blue colored t-shirt and athletic shorts. His hair was unkempt and his face was unshaven. He was observed looking disinterested and never made eye contact with the SSA employees conducting the interview.  Doreen Mitchell and John Mitchell claimed Sonny did not communicate with others and spoke only to them and his girlfriend, needed help completing simple tasks, did not drive, did not shop, could not manage money, and did not associate with anyone he did not know.  Both Doreen Mitchell and Sonny Mitchell signed the redetermination paperwork indicating that they understood that anyone who misrepresented facts or lied to SSA was committing a federal crime.  Doreen Mitchell signed the form in cursive and Sonny Mitchell signed the form, "2 ONNy MiteLL."

27.     Contrary to the representations made to the SSA regarding Sonny Mitchell's functioning and Sonny Mitchell's presentation at the interview, that same day, Sonny Mitchell was seen driving a pick-up truck that displayed magnetic signs advertising on the spot body repair. He was followed to a QT gas station near Doreen Mitchell's residence, where he was observed performing dent repair on a customer's vehicle. He appeared to be compensated with gasoline for his vehicle. After the job was completed, he entered the QT with a female and they purchased items.  He was later observed driving through a nearby Home Depot parking lot looking for body repair work. Sonny Mitchell was also seen soliciting or performing automobile repair work on October 10, 2014; October 17, 2014; October 24, 2014; and October 28, 2014.  In

fact, on October 17, 2014, investigators specifically observed Sonny Mitchell receive cash in exchange for his work. On November 14, 2014, Sonny Mitchell was seen removing dents on a vehicle in the parking lot of his apartment complex and was followed to the self-service carwash, driving that same vehicle, where he washed the exterior. On January 16, 2015, Sonny Mitchell was seen at a funeral home with the rest of his family and, later that day, drove John Mitchell and two unidentified males to the store to purchase beer. He was also seen socializing with friends and family. As he is able to leave the house unaccompanied, drive, handle money, socialize with large groups of people, and perform regular work activity, Sonny Mitchell clearly demonstrates a higher level of functioning than he presented to the SSA.

28. On or about July 21, 2015, Sonny Mitchell also appeared for a consultative examination with Dr. Alicia Coleman for the purpose of determining his continued right to disability benefits. During the interview, Sonny Mitchell was uncooperative, selectively responsive and deemed to be a poor historian, so Dr. Coleman was required to obtain some information from John Mitchell, who appeared as Patrick Rena. Sonny Mitchell wore clothing that appeared dirty and too small and, when asked if there was any type of work he could do, he replied "fix cereal." When asked, he could not identify his age, birthday, the current month, date, or year, the day of the week, or the city, county, and state of the evaluation; however, he knew what floor he was on in the building. John Mitchell indicated Sonny Mitchell was dependent upon him for transportation and required assistance with his finances.

29. As a result of the examination, Dr. Coleman determined that the information Sonny Mitchell presented indicated a developmental intellectual / psychotic disorder, although he exhibited several behaviors discrepant with his reported condition that are consistent with those individuals that overly emphasize the negative aspects of their condition for secondary

gain. She did not believe the examination to be a valid assessment of Sonny Mitchell's abilities or a valid representation of his true level of functioning and current abilities due to lack of cooperation and effort.

30.     In interviews with the SSA, John Mitchell and Doreen Mitchell have stated – and Sonny Mitchell has not corrected them – that he needs assistance with shopping.  However, CDI investigators observed Sonny Mitchell shopping by himself at a Pep Boys automotive store on July 21, 2015, the day of the consultative examination described above.

31.     Based on the above information, including surveillance obtained on September 21, 2015, showing Sonny Mitchell soliciting business for automobile repairs, I have reason to believe that Sonny Mitchell has been and continues to perform work for cash, but has failed to report that work activity or associated income to the SSA.

*Instagram Subject Accounts*

32.     On September 29, 2015, search warrants were executed at Michael Mitchell and Sonny Mitchell's residences and cellular phones and other electronic devices were seized. Pursuant to a valid search warrant, a subsequent forensic review of those devices by SSA / OIG revealed the SUBJECT ACCOUNTS.  Photos on those accounts confirm they belong to Michael Mitchell and Sonny Mitchell.

33.     From my review of publicly available information provided by Instagram about its service, including Instagram's "Privacy Policy," I am aware of the following about Instagram and about the information collected and retained by Instagram.

34.     Instagram owns and operates a free-access social-networking website of the same name that can be accessed at http://www.instagram.com.  Instagram allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and other

information.  Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

35.    Instagram permits users to post photos to their profiles on Instagram and otherwise share photos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter.  When posting or sharing a photo on Instagram, a user can add to the photo: a caption; various "tags" that can be used to search for the photo (e.g., a user may add the tag #vw so that people interested in Volkswagen vehicles can search for and find the photo); location information; and other information.  A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos.  In addition, Instagram allows users to make comments on posted photos, including photos that the user posts or photos posted by other users of Instagram.  Users can also "like" photos.

36.    Upon creating an Instagram account, an Instagram user must create a unique Instagram username and an account password.  This information is collected and maintained by Instagram.

37.    Instagram asks users to provide basic identity and contact information upon registration and also allows users to provide additional identity information for their user profile.  This information may include the user's full name, e-mail addresses, and phone numbers, as well as potentially other personal information provided directly by the user to Instagram.  Once an account is created, users may also adjust various privacy and account settings for the account on Instagram.  Instagram collects and maintains this information.

38.    Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public.  Friends on Instagram

may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles. Instagram collects and maintains this information.

39.     Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user. Users may also "unfollow" users, that is, stop following them or block the, which prevents the blocked user from following that user.

40.     Instagram allows users to post and share various types of user content, including photos, videos, captions, comments, and other materials. Instagram collects and maintains user content that users post to Instagram or share through Instagram.

41.     Instagram users may send photos and videos to select individuals or groups via Instagram Direct. Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

42.     Users on Instagram may also search Instagram for other users or particular types of photos or other content.

43.     For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app. Among the log file information that Instagram's servers automatically record is the particular web requests, any Internet Protocol ("IP") address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

44.     Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram. For example,

Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

45.     Instagram also collects information on the particular devices used to access Instagram.  In particular, Instagram may record "device identifiers," which includes data files and other information that may identify the particular electronic device that was used to access Instagram.

46.     Instagram also collects other data associated with user content.  For example, Instagram collects any "hashtags" associated with user content (i.e., keywords used), "geotags" that mark the location of a photo and which may include latitude and longitude information, comments on photos, and other information.

47.     Instagram also may communicate with the user, by email or otherwise.  Instagram collects and maintains copies of communications between Instagram and the user.

48.     As explained herein, information stored in connection with an Instagram account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, an Instagram user's account activity, IP log, stored electronic communications, and other data retained by Instagram, can indicate who has used or controlled the Instagram account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, direct messaging logs, shared photos and videos, and captions (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the Instagram account at a relevant time.  Further, Instagram account activity can show how and when the account was

accessed or used.  For example, as described herein, Instagram logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.    Such information allows investigators to understand the geographic and chronological context of Instagram access, use, and events relating to the crime under investigation.    Additionally, Instagram builds geo-location into some of its services.    Geo-location allows, for example, users to "tag" their location in posts and Instagram "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Instagram account owner.  Lastly, Instagram account activity may provide relevant insight into the Instagram account owner's state of mind as it relates to the offense under investigation.  For example, information on the Instagram account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49.    Relevant to this investigation, if Michael Mitchell and Sonny Mitchell – who alleged they could not read or write, could not associate with people they did not already know, and were generally unable to perform tasks of daily living – hold and use Instagram accounts, they are likely to contain evidence of the higher level of functioning they continue to conceal from the SSA.  Therefore, based on the information above, the computers of Instagram are likely to contain all the material described above with respect to the SUBJECT ACCOUNTS, including stored electronic communications and information concerning subscribers and their use of Instagram, such as account access information, which would include information such as the IP

addresses and devices used to access the account, as well as other account information that might be used to identify the actual user or users of the account at particular times.

## Information To Be Searched And Things To Be Seized

50.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular Title 18, United States Code, Sections 2703(a), (b)(1)(A), and (c)(1)(A), by using the warrant to require Instagram to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## Conclusion

51.     Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of violations, or attempted violations, of 42 U.S.C. § 1383a(a)(3) may be located in the SUBJECT ACCOUNTS described in Attachment A.

52.     This Court has jurisdiction to issue the requested warrant to Instagram because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A),  (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).]

53.     Based on the forgoing, I request that the Court issue the proposed search warrant.

54.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Because the warrant will be served on

Instagram, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

55.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an aspect of this investigation that is has not been made known to the targets of the investigation, and there is a concern that disclosure of this information may lead the targets to destroy or otherwise tamper with evidence.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation. A separate order has been prepared to that effect.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

CYNTHIA M. ROBERTS
Special Agent
Social Security Administration / OIG

SUBSCRIBED and SWORN to before me on this 27th day of May, 2016

IRMA CARRILLO RAMIREZ
United States Magistrate Judge

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Instagram, LLC, and my official title is _____. I am a custodian of records for Instagram, LLC. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Instagram, LLC, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b. such records were kept in the ordinary course of a regularly conducted business activity of Instagram, LLC; and,

c. such records were made by Instagram, LLC as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.


_____          _____
Date                                          Signature